**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

                *Plaintiff*,

    v.

                                            Case No. __

RUSSELL COLEMAN, in his official capacity
as the Kentucky Attorney General,
  1024 Capital Center Drive, Suite 200
  Frankfort, KY 40601
  *Served via* ServetheCommonwealth@ky.gov

                *Defendant*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Institutional Shareholder Services Inc. ("ISS") brings this Complaint for declaratory and injunctive relief against Russell Coleman, in his official capacity as Attorney General of the Commonwealth of Kentucky, to challenge a newly enacted Kentucky statute, S.B. 183. If allowed to take effect, S.B. 183 will subject ISS to what lawmakers described as an "extensive and painstaking" regime of state-mandated warnings whenever ISS provides advice to *any* of its clients—including those outside of Kentucky—based on considerations that Kentucky disagrees with. Because the law takes effect on July 15, 2026—and threatens ISS with ruinous fines—ISS respectfully requests a decision on its forthcoming motion for a preliminary injunction in advance of the law's effective date of July 15, 2026.

**PRELIMINARY STATEMENT**

1.     With 40 years of corporate governance expertise, Plaintiff ISS is a leading proxy advisor that provides services to meet market demand from institutional investors for corporate governance and investing solutions. A proxy advisor is an independent third-party service

1

provider that sophisticated institutional investors hire to provide information, advice, and recommendations to help them decide how to vote on board elections, shareholder proposals, and other shareholder votes.

2.      Before proxy advisors like ISS offered their services to institutional investors, those investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios.  That changed after ISS, in the 1980s, became the first proxy advisor.  ISS' services allowed institutional investors to "get objective, sophisticated, well-researched opinions about proxy issues," George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1289 (2014), thus helping institutional investors to make their own informed decisions about how to vote their shares in line with their own investing priorities and proxy voting preferences.  For each shareholder vote, ISS analyzes relevant data, reviews voluminous proxy materials, and provides its clients with reports that provide extensive information about the votes at issue and make recommendations according to criteria that are selected by its investor clients to fit their specific needs and priorities regarding corporate governance matters.

3.      ISS is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq. ("Advisers Act").  As such, ISS owes its clients fiduciary duties of care and loyalty.

4.      Senate Bill 183 ("S.B. 183"), which was enacted over the Governor's veto, imposes onerous disclosure obligations on proxy advisors, including ISS, when they issue a recommendation or advice to a client that is, according to the law's idiosyncratic definitions, not

2

"solely in the interest of shareholders" or "materially different" from advice the advisor gives to a different client.  S.B. 183 §§ 2(1), (3).

5.      Under S.B. 183, a recommendation is "not solely in the interest of shareholders" if it "takes into account" a "nonpecuniary interest[] or subordinates the financial interests of shareholders to other objectives" or, in certain circumstances, is "inconsistent" with the recommendation offered by the company's board of directors.  *Id.* § 2(1).  "Nonpecuniary" interests "include[] but [are] not limited to an environmental, social, political, or ideological interest which does not have a direct and material connection"—broadly and unhelpfully defined as "a substantial likelihood that a reasonable investor would consider it important"—"to the financial risk or financial return of an investment."  *Id.* § 1(5), (7).

6.      If ISS issues such recommendations, S.B. 183 requires ISS to issue a series of warnings.  ISS must tell not only its clients receiving the recommendation, but also the company whose shareholder vote is involved in the recommendation, that ISS' services are "not being provided solely in the interest of shareholders and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk"—even though that statement is false.  *Id.* § 2(2)(a)(1).

7.      S.B. 183 requires ISS to issue a similarly misleading "disclosure" when it provides "materially different advice to different clients," *id.* § 2(3), which the statute defines as occurring anytime ISS recommends voting "in opposition to the recommendation of the company's management" or "simultaneously" advises one client to vote for and another client to vote against a proposal or nominee for the company's board.  *Id.* § 1(6).  In that scenario, the law orders ISS, among other things, to "[n]otify" the client, the company that is the subject of the advice, and the Kentucky Attorney General that ISS has given "materially different advice," and then "disclose"

3

the advice that is "solely in the interest of shareholders" and "[s]upported by an economic analysis." *Id.* § 2(3).  This economic-analysis requirement applies regardless of the fact that many issues that generally come up for a shareholder vote do not lend themselves to financial prediction—like whether to vote for or against reelecting a particular board member who has missed too many meetings in the past, or whether to vote for or against a nonbinding request that a company prepare an additional report analyzing its supply chain vulnerability to climate change. And the law ignores that different clients ask ISS to give advice based on each client's own (and often differing) views about the best way to advance shareholder value.

8.      If ISS fails to comply with any of these requirements, S.B. 183 makes that failure a deceptive trade practice, S.B. 183 § 3(1), (3)(b), punishable by up to $2,000 "per violation," Ky. Rev. Stat. § 367.990(2).  The law takes effect on July 15, 2026.  *See* Commonwealth of Kentucky, Office of the Attorney General, Opinion No. 26-03 (Apr. 20, 2026), https://perma.cc/RBD9-F795.

9.      S.B. 183 extends its mandates far beyond Kentucky's boundaries.  S.B. 183's disclosure requirements apply to any proxy advisory service made "in connection with or in relation to a company" that is "doing business" within Kentucky, S.B. 183 § 1(1)—a broad category that "includes but is not limited to," among other things, companies that sell products to Kentuckians, *see* Ky. Rev. Stat. § 141.010(13).  The law thus purports to apply to *all* advice or recommendations that ISS—an out-of-state company—makes to *any* of its clients *anywhere* on Earth—whether in Kentucky, Maine, or Switzerland—if the company that is the subject of ISS' advice has even a nominal connection to Kentucky.

10.     S.B. 183 violates the U.S. Constitution multiple times over.

11.     First, S.B. 183 violates the First Amendment.  S.B. 183 forces ISS to recite a series of misleading and false "warnings" about ISS' services whenever those services touch on topics

or express views that Kentucky dislikes.  The law thus not only impermissibly compels ISS'

speech, it does so based on unlawful content and viewpoint discrimination:  The law aims to force

proxy advisors to conform their advice to what Kentucky believes investors *should* prioritize by

punishing proxy advisors who instead align their recommendations with the objectives their clients

*do* prioritize.  The First Amendment does not tolerate such state-imposed discrimination on a proxy

advisor's private speech.

12.    Second, the law is unconstitutionally vague.  S.B. 183 is riddled with vague terms

about when and how ISS must make the Commonwealth's compelled warnings—a set of

labyrinthian requirements that invite arbitrary enforcement by the Attorney General backed by

business-crushing fines.

13.    Third, S.B. 183 violates the dormant Commerce Clause.  The Constitution forbids

states from flexing the kind of extraterritorial reach that S.B. 183 does.  "The Commerce

Clause . . . precludes the application of a state statute to commerce that takes place wholly outside

of the State's borders."  *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982) (plurality op.).  The

Commonwealth of Kentucky may not dictate how other states and countries regulate business in

their own jurisdictions.

14.    The consequences of not enjoining S.B. 183 as an unconstitutional exercise of state

power are severe:  By staining ISS' recommendations with disparaging requirements, S.B. 183

threatens to distort the free flow of information that sophisticated investors rely on when managing

their investment portfolios all over the world.

15.    For more than three decades, the SEC has recognized that inserting government

regulators "into every exchange and conversation among shareholders, their advisors and other

parties on matters subject to a vote certainly would raise serious questions under the free speech

5

clause of the First Amendment." Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,279 (Oct. 22, 1992). S.B. 183 is just the latest in an unsuccessful and unconstitutional chapter of states attempting to deviate from that basic principle to target proxy advisors for the content of their speech. Texas passed a substantively identical law last year—and a District Court promptly enjoined it before it took effect. *See* Text Order, *Institutional Shareholder Servs. Inc. v. Paxton*, No. 1:25-cv-01160 (W.D. Tex. Aug. 29, 2025). Missouri tried something similar and, when it failed, left taxpayers to foot the bill for the plaintiff's legal fees. *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 801 (W.D. Mo. 2024). S.B. 183 is of the same ilk, and this Court should likewise hold it unconstitutional as applied to ISS.

## PARTIES

16. Plaintiff Institutional Shareholder Services Inc. ("ISS") is a corporation organized in Delaware with its headquarters at 702 King Farm Boulevard, Suite 300, Rockville, MD 20850. ISS supplies proxy voting advice and other forms of investment advice to institutional investors, including to clients in Kentucky.

17. Defendant Russell Coleman is the Kentucky Attorney General and, therefore, is responsible for enforcing S.B. 183. *See* S.B. 183, § 3(1), (3)(a)-(b), (4); Ky. Rev. Stat. §§ 367.170, 367.990(2). He is sued in his official capacity. The Attorney General maintains an office at 1024 Capital Center Drive, Suite 200, Frankfort, KY 40601.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff's claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

19.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

20.    The Attorney General is not immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for violations of federal law.  *See Ex parte Young*, 209 U.S. 123 (1908); *see also Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1040 (6th Cir. 2022) (plaintiff may bring suit against the state official with "direct authority" to enforce a state statute).

21.    There is every reason to believe that the Attorney General will vigorously enforce S.B. 183 against ISS.  Kentucky's previous Attorney General co-signed a demand letter to ISS and another proxy advisory firm accusing them of violating various states' "prohibitions on unfair or deceptive trade practices" based on a theory now codified in S.B. 183: that proxy advice with any environmental, social, and governance ("ESG") consideration is "contrary to the financial interests" of shareholders.[1]  That same Attorney General also co-signed a letter to Congress criticizing a Department of Labor rule for "embrac[ing] managers' use of ESG factors in investment decisions and proxy voting."[2]  And in 2022, the Kentucky Attorney General's Office issued an official opinion finding that "environmental, social, and governance" investment practices "are inconsistent with Kentucky law governing fiduciary duties" to Kentucky's public pension plans, an opinion that the current Attorney General has not rescinded.[3]

---

[1] Letter from State Attorneys General to ISS and Glass Lewis (Jan. 17, 2023), https://perma.cc/NNW4-64B4.

[2] Letter from State Attorneys General to Congress (Feb. 14, 2023), https://perma.cc/D7XF-AU98.

[3] Commonwealth of Kentucky, Office of the Attorney General, Opinion No. 22-05 (May 26, 2022), https://perma.cc/E56N-YLK9.

22.     S.B. 183, which the bill's sponsor stated was designed to target ISS "in particular,"[4] would empower the Attorney General to continue this campaign: The law labels the failure to comply with its requirements an "unfair, false, misleading, or deceptive act or practice" actionable by the Kentucky Attorney General under Kentucky's consumer protection law, and allows the Kentucky Attorney General to intervene in suits brought by private parties. S.B. 183 § 3(1), (3)(a).

23.     As a directly regulated entity, ISS plainly has standing to bring this challenge. S.B. 183 inflicts numerous harms on ISS. *See infra* ¶¶ 60-67. ISS engages in constitutionally protected speech, which S.B. 183 directly regulates even when that speech occurs wholly outside of Kentucky. Absent an injunction, Kentucky's law and the threat of significant penalties for noncompliance would chill ISS' constitutionally protected speech, violate ISS' constitutional due process rights, impermissibly regulate ISS' transactions that occur wholly outside of Kentucky's borders, and excessively burden interstate and foreign commerce.

24.     Venue is proper in this District because Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiff's claims occurred in this District, *id.* § 1391(b)(2).

## BACKGROUND

### I.     Proxy Advisory Services

25.     Publicly traded companies are required to hold annual and special meetings to conduct business that may require shareholder approval. At these meetings, shareholders vote on

---

[4] Ky. Senate Economic Development, Tourism & Labor Committee Hr'g at 7:20-7:35 (Feb. 5, 2026) (Sen. Nunn), https://ket.org/legislature/archives/2026/regular/senate-economic-development-tourism-labor-committee-room-169-74macd; Ky. House Banking & Insurance Committee Hr'g at 13:10-14:00 (Mar. 11, 2026) (Sen. Nunn), https://ket.org/legislature/archives/2026/regular/house-banking-and-insurance-committee-room154.

various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which a corporation's charter or bylaws require a shareholder vote.

26. Matters requiring shareholder votes are compiled into a "proxy statement," which contains information about pending resolutions and other votes for upcoming shareholder meetings and are distributed to shareholders in advance. At the meetings, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

27. The issues put to a shareholder vote range in complexity, including everything from changing a corporate name or approving an auditor, to electing the board of directors, making key management decisions, or approving proposed mergers and acquisitions.

28. Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, disclosure and transparency factors, as well as risks to the company stemming from environmental and social factors. Shareholder proposals are a component of shareholder democracy, as they allow shareholders to express their views on significant issues facing the companies that the shareholders collectively own. The results of a vote on a shareholder proposal are typically non-binding, but by submitting proposals and "voting their shares" in corporate elections, shareholders may influence how companies are run.

29. Institutional investors include pension plans, asset managers, and mutual funds. Because of their vast stock holdings in multiple companies, institutional investors regularly cast thousands of votes every year on complex questions across these companies. Shareholder meetings of U.S. companies tend to be concentrated during the four-month period from March to June—a time period known as "proxy season." There is a similar concentration in this time frame of meetings in other major capital markets (such as Canada, Europe, Asia). This compressed

timeline compounds the challenges associated with voting decisions for institutional investors. To navigate the volume of shareholder votes and complexity of issues, institutional investors often hire independent proxy advisors to provide research and advice on how they should vote on an issue in a shareholder meeting. A proxy advisor aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot proposals put forth by companies or shareholders, and provides voting advice in accordance with the investor client's selected criteria and priorities.

## II.     ISS And Proxy Advising

30.     Founded in 1985, ISS is a full-service proxy advisor that helps institutional investors make informed voting decisions, manage the complex process of voting their shares, and report their votes to stakeholders and regulators. ISS fulfills market demand for objective and impartial advice and analysis, and its client base includes many of the world's most sophisticated institutional investors. In 2025 alone, ISS assisted approximately 1,400 clients make and execute informed proxy voting decisions for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide. ISS makes voting recommendations for board elections, board/management proposals, and shareholder proposals, only for the companies in which its clients hold shares, and only based on the client's selected voting policy or policies. ISS does not put forth shareholder proposals, nor does ISS assist any clients in formulating shareholder proposals.

31.     ISS has no financial interest in the outcome of a shareholder vote. ISS does not seek to maintain or gain control of a corporation, or to win the passage (or defeat) of a ballot measure. A proxy advisor, "although it holds itself out to attract clients, does not initiate the exchange; it provides advice only in response to the client's request." *ISS v. SEC*, 142 F.4th 757,

10

767 (D.C. Cir. 2025). ISS offers research and analysis to its clients to help inform their own evaluation of the proposals on which they are entitled to vote.

32. As a registered investment adviser, ISS is subject to a comprehensive regulatory regime under the Advisers Act. Registered advisers are subject to the Advisers Act's registration, reporting, and conduct requirements. As a registered investment adviser, ISS is subject to the Advisers Act's fiduciary duties of care and loyalty, which follow the contours of ISS' contractual relationship with its clients.

33. Although ISS is a registered investment adviser, it "does not manage investment accounts."[5] As ISS explains in its public-facing brochure, ISS also does not "make buy, sell or hold investment recommendations to clients, other than indirect purchase or sale recommendations that might be implicit in a proxy voting recommendation, such as a recommendation on a vote on whether or not to approve a proposed merger transaction." *Id.* ISS states in the same brochure that it "does not guarantee that its advice will produce any particular investment return or other results for clients." *Id.*

34. As part of its core offerings, ISS provides proxy voting recommendations based on its research and corporate governance data. Importantly, it provides these recommendations to each client based on the proxy voting policies selected by its clients. Institutional investors are not monolithic, and so ISS tailors its advice to the directives, priorities, and goals the client selects. Recommendations extend to votes on all issues that appear on the ballot for which shareholders are entitled to vote, including core issues of corporate governance, such as board of directors elections, shareholder rights, and executive compensation.

---

[5] ISS, Part 2 Brochures at 11 (updated Mar. 31, 2026), https://perma.cc/MDL6-WDC4.

35.     ISS provides its proxy advisory services to its clients in exchange for fees.  ISS' proxy advisory services meet a market need, which is why institutional investors are willing to pay for the services.  ISS does not provide proxy voting advice to any investor who has not specifically engaged ISS for this purpose.

36.     ISS is organized in Delaware and its headquarters is in Maryland.  ISS has no offices or employees with a home address in Kentucky.

37.     ISS provides proxy advisory services to about 1,400 clients around the country and the world.  ISS currently provides research and voting services to only two clients in Kentucky.

**A.     ISS Offers Three Policy Frameworks: Custom, Benchmark, and Specialty Policies**

38.     In order to meet the needs of its diverse clientele, ISS offers three different types of voting policies, which are market-specific frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies; (2) the Benchmark Policy; and (3) various Specialty Policies, which also are known as Thematic Policies.

**(1)     Custom Policies**

39.     Custom Policies are designed by ISS' clients or in some cases third parties to address clients' unique needs and preferences.  ISS assists investors in administering custom voting policies that investors develop, in consultation with their governance departments, boards of trustees, and portfolio managers.  A client's Custom Policy reflects the client's own specific approach to proxy voting and/or the mandates they have with the clients for whom they manage assets.

40.     By many measures, Custom Policies are the most significant category of policies at ISS.  In 2025, ISS issued Custom Policy vote recommendations under approximately 450 Custom Policies, including approximately 250 U.S. Custom Policies.  In 2024, approximately 90%

of the shares for which ISS processed voting instructions globally on behalf of its clients were owned by clients that had Custom Policies.

### (2)    Benchmark Policy

41.    The Benchmark Policy is a policy that ISS created and updates each year and to which ISS clients may subscribe.  The Benchmark Policy is based on ISS' four key tenets: accountability, stewardship, independence, and transparency.  The Benchmark Policy is publicly available on ISS' website.[6]  The Benchmark Policy explains in detail ISS' general framework for providing advice on particular issues and the criteria considered in making case-by-case voting decisions.

42.    ISS forms its Benchmark Policy through an annual review and development process.  ISS starts by collecting feedback from a diverse range of market participants through multiple channels: an annual policy survey, roundtables with investor clients and corporate directors, and ongoing feedback during proxy season.  ISS uses these inputs and ISS' expertise to develop its draft policy updates each year.  ISS then publishes draft updates for an open review and comment period.  Anyone can comment or participate in the survey process—including investors, companies, and the general public.  ISS reviews these comments before publishing its final updated policy at the end of each year, to apply to meetings held after February of the following year.

43.    Much of the Benchmark Policy is designed to protect shareholders from what market participants and clients have generally deemed to be weak corporate governance practices. For example, based on market input, ISS generally recommends that shareholders vote against

---

[6] ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025), https://www.iss-stoxx.com/file/policy/current/americas/us-voting-guidelines.pdf   ("2026   U.S. Benchmark Policy").

board nominees if the board adopted certain policies called "poison pills"—a defensive tactic to try to defeat takeover bids—without shareholder approval, because poison pills risk entrenching corporate managers unresponsive to shareholders. *See* 2026 U.S. Benchmark Policy at 15. ISS also recommends voting against "overboarded directors," meaning directors who sit on too many company boards to give another board sufficient care and attention. *Id.* at 13. ISS recommends voting against directors and boards that adopt provisions "materially adverse to shareholder rights," such as "[s]upermajority vote requirements" for amending the company's bylaws or charter, or "classified board structure[s]" that divide a company's board into classes serving staggered terms, diminishing director accountability to shareholders. *Id.* at 16. And the Benchmark Policy generally recommends voting against proposals that insulate directors from removal, and for proposals "to restore shareholders' ability to remove directors with or without cause." *Id.* at 24.

### (3)    Specialty Policies

44.    In addition to the Custom Policies and the Benchmark Policy, ISS also offers seven Specialty Policies, also known as Thematic Policies, that evaluate governance issues from a variety of specific perspectives: (1) faith-based, (2) board-aligned, (3) labor unions, (4) public funds, (5) sustainability, (6) social responsibility, and (7) climate. As with the Benchmark Policy, ISS publishes the Specialty Policies on its website.[7] The Specialty Policies are intended to address common client preferences when it comes to certain strategic, policy, and social issues. ISS crafted these policies to meet client demand for coverage tailored to these specific approaches and the factors that the clients demanding these policies view as material.

---

[7] ISS, Current Voting Policies, 2026, https://www.iss-stoxx.com/stewardship/voting-policy-gateway/proxy-voting-policies/ (select from "Our Thematic Policies" dropdowns).

14

45.    For example, ISS developed its U.S. Global Board-Aligned Policy in response to market demand for voting recommendations that generally defer to board judgment on environmental and social issues.[8]  The Global Board-Aligned Policy thus uses a "presumption on environmental and social topics that the board's recommendations should generally prevail"; the policy generally recommends voting against shareholder proposals that request the company to disclose reports of the company's levels of greenhouse-gas emissions or its reduction targets.  U.S. Global Board-Aligned Policy at 74.

46.    As another example, ISS' U.S. Catholic Faith-Based Policy generally takes as its "frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility."[9]  U.S. Catholic Faith-Based Policy at 11.  This policy recognizes faith-based investors' "dual objectives: financial and social."  *Id.*  These faith-based investors "invest for economic gain, as do all investors, but they also require that companies in which they invest conduct their business in a socially and environmentally responsible manner."  *Id.*

**B.    ISS Applies Its Clients' Chosen Framework(s) To Provide Advice On Proxy Votes**

47.    Clients' Custom Policies and ISS' Benchmark and Specialty Policies detail frameworks for addressing corporate governance issues.  When clients select these policies, they ask ISS to apply the policy or policies they selected to upcoming shareholder meetings.  ISS then

---

[8] ISS, U.S. Global Board-Aligned Proxy Voting Guidelines, 2026 Policy Recommendations (Jan. 16, 2026), https://www.iss-stoxx.com/file/policy/current/specialty/global-board-aligned-us-voting-guidelines.pdf ("U.S. Global Board-Aligned Policy").

[9] ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://www.iss-stoxx.com/file/policy/current/specialty/catholic-us-voting-guidelines.pdf ("U.S. Catholic Faith-Based Policy").

15

provides clients with reports summarizing its research and providing voting recommendations based on the particular policy or policies to which each client subscribes.

48.     ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to come up with a voting recommendation.  ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice, nor does ISS engage in solicitation activities in support of (or against) any ballot item.

49.     ISS has no financial interest in the outcome of any shareholder vote, regardless of whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether.  Indeed, because ISS' clients have a wide variety of different policies and voting criteria, ISS often provides different clients with different recommendations about the same vote, depending on the voting criteria the client selects.  For example, ISS may advise clients using its Benchmark Policy to vote for a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

### C.     Additional Services

50.     ISS also provides other services, which are sometimes performed in connection with an upcoming proxy vote and sometimes not.  ISS provides general environmental, social, and governance data and ratings; thought leadership, research, and other market information on corporate governance and voting practices and trends; and portfolio screening and other assessment tools and services.  ISS also provides services tailored to markets in other countries.

### III.     Kentucky S.B. 183

51.     Proxy advisors have come under increasing attack in recent years.  The President has issued an executive order targeting ISS and one of its competitors for "regularly" advancing so-called ESG "agendas."  Exec. Order No. 14,366, *Protecting American Investors From Foreign-*

*Owned and Politically-Motivated Proxy Advisors*, 90 Fed. Reg. 58,503 (Dec. 11, 2025). Last year, Texas enacted a law expressly aimed at stifling ISS' speech when that speech includes recommendations based on considerations the Texas legislature did not like. *See* Texas S.B. 2337. The law was preliminarily enjoined before taking effect. *See* Text Order, *Institutional Shareholder Servs. Inc. v. Paxton*, No. 1:25-cv-01160 (W.D. Tex. Aug. 29, 2025). Other states too are enacting laws targeting speech by proxy advisors[10]—apparently inspired by a model law drafted by an advocacy group calling itself "Consumers Defense," a group whose self-proclaimed "mission" is to "protect[ ] Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects."[11]

52. Kentucky S.B. 183 similarly imposes onerous disclosure obligations on those who provide "proxy advisory service[s]" that, under the law's idiosyncratic definitions, are not "solely in the interest of shareholders" or involve "materially different advice to different clients." S.B. 183 § 2. The law is triggered when a proxy advisor like ISS provides services "in relation to" any "business entity that is doing business in" Kentucky, *see id.* § 1(1), (10), a category that includes both Kentucky companies and companies governed by the laws of other states and countries, Ky. Rev. Stat. § 141.010(13). A proxy advisor that fails to comply with the law's "extensive and painstaking" requirements[12] is deemed to have committed "an unfair, false, misleading, or

---

[10] Indiana and Kansas have enacted such laws. *See* Indiana H.B. 1273 (2026); Kansas S.B. 375 (2026). ISS has filed lawsuits against each state's Attorney General to enjoin the law's application as to ISS. *See ISS v. Rokita*, No. 1:26-cv-00717 (S.D. Ind.); *ISS v. Kobach*, No. 2:26-cv-2254 (D. Kan.).

[11] Consumers Defense, https://consumersdefense.com/ (last visited May14, 2026); *Proxy Advisor Transparency Act*, Consumers Defense, https://consumersdefense.com/model-legislation/proxy-advisor-transparency-act/#view-updates (last visited May 14, 2026).

[12] Ky. Senate Chambers Hr'g at 15:15-15:40 (Feb. 10, 2026) (Sen. Thomas), https://ket.org/legislature/archives/2026/regular/senate-chambers-8egjh6.

deceptive act," which is actionable by the Kentucky Attorney General.  S.B. 183 § 3(1), (3).  The Attorney General may seek injunctive relief, as well as civil penalties of $2,000 per violation.  Ky. Rev. Stat. § 367.990(2).

### A.    Mandated Warnings For "Nonpecuniary" and Independent Advice

53.    S.B. 183 imposes onerous disclosure obligations on ISS when it gives advice about companies in two main circumstances where the law deems the advice "not solely in the interest of shareholders."  S.B. 183 § 2(2).

54.    ***"Nonpecuniary" Advice.***  First, S.B. 183 labels ISS' advice to be "not solely in the interest of shareholders" if it is "wholly or partly based on, or otherwise takes into account, one (1) or more nonpecuniary interests or subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote or further nonpecuniary interests."  *Id.* § 2(1)(a).  The law does not provide a comprehensive definition of what counts as "nonpecuniary interests," but states that the category includes "an environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment."  *Id.* § 1(7).  The statute also does not define a "direct connection," but defines a "material connection" as a "substantial likelihood that a reasonable investor would consider it important in determining the financial risk or the financial return of an investment."  *Id.* § 1(5).

55.    ***Advice Contrary To Or "Inconsistent" With The Company Board's View.***  Second, S.B. 183 automatically deems advice to be "not solely in the interest of shareholders" when it (1) advises that a client vote on a shareholder proposal in a way that is "inconsistent with the voting recommendation of the company's board" and is not supported by a "written economic

18

analysis of the financial impact on shareholders of the proposal,"[13] or (2) "[a]dvises against a company proposal to elect a governing person unless" ISS "affirmatively states" that it "rendered such advice solely in the interest of the shareholders of the company." *Id.* § 2(1)(b)-(c).

56.    When a proxy advisor's recommendation falls into any of these statutorily defined categories, S.B. 183 requires the advisor to issue a so-called "disclosure" to "each shareholder or entity or other person acting on behalf of a shareholder receiving the proxy advisory service"—as well as "the company that is subject to the proxy advisory service." *Id.* § 2(2). This "disclosure" must "[c]onspicuously state[]" that the advice is "not being provided solely in the interest of shareholders" and "subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk." *Id.* § 2(2)(a)(1). This warning must also "[e]xplain[], with particularity, the basis of the" advice, "including but not limited to the company or companies for which the advice applies to and the nonpecuniary interests used in the basis of the advice." *Id.* § 2(2)(a)(2).

**B.    Mandated Warnings For "Materially Different Advice"**

57.    S.B. 183 imposes additional requirements if a proxy advisor gives "materially different advice" to different clients on how to vote on a proposal. *Id.* § 2(3).

58.    The statute defines advice as "materially different" when the proxy advisor "simultaneously" advises that (1) at least one client vote "for" and at least one client vote "against"

---

[13] S.B. 183 defines an "economic analysis" as a "written analysis of the economic impact" of the proposal that includes, "at a minimum": "[t]he subject matter of the shareholder-sponsored proposal"; "[w]hether the board . . . opposes the shareholder-sponsored proposal and the stated reasons for the opposition"; "[w]hether the shareholder-sponsored proposal is consistent with the investment policy of the shareholder receiving the advice"; "[t]he economic benefits and costs of implementing the shareholder-sponsored proposal, as written, in the long and short term"; "[t]he quantifiable impact of the shareholder-sponsored proposal, as written, on the investment returns of the shareholder receiving the advice"; and "[a]n explanation of the modeling, procedures, and processes used to complete the economic analysis." S.B. 183 § 1(4).

a proposal; (2) at least one client vote "for" and at least one client "vote against or abstain from voting for" a nominee to the company's "governing authority;" and (3) any client vote "against the proposal in opposition to the recommendation of the company's management." *Id.* § 1(6).

59.    If a proxy advisor provides such "materially difference advice" to clients "who have not expressly requested proxy advisory services for a nonpecuniary interest," *id.* § 2(3), the statute imposes additional burdens.  In addition to complying with the disclosure obligations governing advice "not solely in the interest of shareholders"—that is, warnings to the advisor's clients and the company, *see supra* ¶ 56—the proxy advisor must issue another set of disclosures to (1) "each shareholder or entity or other person acting on behalf of a shareholder receiving the proxy advisory service," (2) "the company that is subject to the materially different advice," and (3) the Kentucky Attorney General.  S.B. 183 § 2(3)(b).  To each of these entities, the proxy advisor must disclose that the advisor provided "materially different advice" and must also identify "the advice or recommendation that is . . . [p]rovided solely in the interest of shareholders" and "[s]upported by an economic analysis performed and relied upon by the proxy advisor." *Id.*

## IV.    S.B. 183 Will Result In Direct, Concrete Harms To Plaintiff ISS

60.     S.B. 183 violates ISS' free speech rights under the First Amendment, is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment, and is impermissibly extraterritorial under the dormant Commerce Clause, the Fourteenth Amendment, and separation-of-powers principles.

61.    S.B. 183 will irreparably harm ISS by depriving ISS of its constitutional rights under the First and Fourteenth Amendments.  S.B. 183 discriminates based on content and viewpoint, and the law's mandated warnings compel ISS to speak a message that it believes is false: that ISS' services are "not being provided solely in the interest of shareholders" and

20

"subordinates the financial interests of shareholders to other objectives." S.B. 183 § 2(2)(a)(1). Disseminating that false message will irreparably harm ISS' reputation as a trusted adviser to its clients. If, on the other hand, ISS refuses to speak Kentucky's mandated script, ISS will be forced to self-censor its speech or refrain from speaking at all—or else face punishing fines.

62.     ISS fundamentally disagrees with the premise of S.B. 183. ISS does not believe that it "subordinates" or acts "not solely in shareholders' interests" when it advises clients to vote in a way that is "inconsistent" with company boards. ISS likewise does not believe that consideration of "environmental, social, political, or ideological interest[s]" "subordinates" shareholders' interests. *See id.* §§ 1(7), 2(1)(a), 2(2)(a)(1). As explained above, ISS seeks to help its clients reach their own objectives by providing expert analysis on particular ballot items through the lens of the client's chosen framework. ISS is not in the practice of telling clients—all of which are sophisticated institutional investors—that their stated objectives are against their own interests. ISS likewise would not say that a client's stated objectives "sacrific[e] investment returns or undertak[e] additional investment risk." *See id.* § 2(1)(a), (2)(a)(1).

63.     ISS also does not believe that providing different clients with different advice tailored to clients' differing preferences is a defect that risks misleading its clients; rather, tailored advice is precisely what ISS' sophisticated clients expect to receive. And the mere fact that ISS gives different advice to different clients does not mean that a subset of that advice must be "nonpecuniary." S.B. 183 falsely presumes there must be a single correct decision in a proxy vote, but these decisions are by their nature judgmental, and the "correct" answer may—and often does—differ from one client to another based on that client's priorities. Requiring ISS to identify, when it gives different advice to different clients based on different considerations, which of its advice was "[p]rovided solely in the interest of shareholders," S.B. 183 § 2(3)(b)(1), is problematic

because doing so would require ISS to engage in a fraught comparative analysis, implicitly ranking the value of clients' preferences and forcing ISS to take public positions on controversial issues. Forcing ISS to create this speech and say these self-denigrating statements infringes ISS' constitutional rights.

64.    Forcing ISS to disseminate this speech widely, including to the companies about which ISS is providing advice, further compounds these harms.

65.    Attempting to comply with S.B. 183's labyrinthian requirements would also harm ISS.  The statute is riddled with vague terms, making it difficult for ISS to determine what is required.  And if ISS guesses incorrectly, ISS faces the same ruinous fines despite its efforts.

66.    Attempting to comply with S.B. 183 would also work a severe financial hardship on ISS, even aside from the specter of devastating fines, including by requiring ISS to develop systems to supply an enormous volume of information to numerous entities and track information that ISS does not currently collect.  Designing a system with tracking and reporting capabilities— if it is even possible—would be extraordinarily expensive, require tremendous personnel resources, and likely take substantial time to develop.  If ISS does not comply, ISS risks significant penalties of up to $2,000 per violation.

67.    S.B. 183 further threatens ISS' reputation and client relationships, as clients with interests in Kentucky companies may no longer be willing to retain ISS' services if doing so means that ISS would be forced to disclose tailored advice to third parties.

**COUNT ONE**

**(First and Fourteenth Amendments—Freedom of Speech)**

68.    ISS incorporates all prior paragraphs of this Complaint.

69.    The First Amendment, which applies to the States through the Fourteenth

22

Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I.  S.B. 183 is unconstitutional as applied to ISS.

70.    ISS engages in speech and expression protected by the First Amendment when it provides independent advice, recommendations, and analysis to its clients. *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 767 (2018) ("professional speech" protected by First Amendment).  ISS' speech and expression address matters of critical importance, including topics such as who should govern a company, corporate transactions like mergers and acquisitions, executive compensation, corporate governance policies, and social and environmental issues that corporate boards or shareholders put on ballots and on which institutional investors must make voting decisions—and is thus at the core of the First Amendment's protections.

71.    S.B. 183 burdens ISS' protected speech and cannot survive any level of scrutiny.

72.    ***Content and viewpoint discrimination***.    S.B. 183 is a presumptively unconstitutional content-based regulation of speech.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  S.B. 183's burdensome requirements are triggered only if ISS provides advice on certain topics:  If ISS provides advice "against" or "inconsistent" with company management; if ISS provides different advice to different clients on a shareholder proposal; or if ISS provides advice involving "an environmental, social, political, or ideological interest," unless ISS can prove that those considerations have "a direct and material connection"—that is, "a substantial likelihood that a reasonable investor would consider it important . . . to the financial risk or financial return of an investment."  S.B. 183 §§ 1(5), (7), 2.  S.B. 183 thus " 'on its face' draws distinctions based on the message a speaker conveys," *Reed*, 576 U.S. at 163-164, and enforcement would necessarily require the Kentucky

Attorney General to examine the content of ISS' speech to determine if the disclosure requirements applied, *see McCullen v. Coakley*, 573 U.S. 464, 479 (2014). Many of S.B. 183's triggering conditions involve the most "egregious" form of content discrimination by discriminating on the basis of viewpoint. *See id.* at 482 (citation omitted). Imposing substantial costs on those who advise against the positions of company management—but giving those who state agreement with the board a free pass—necessarily puts a price on dissent. But the First Amendment "secures, even and especially, the right to voice dissenting views." *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026).

73. S.B. 183 is also impermissibly "aimed at particular speakers" and riddled with other content- and viewpoint-based exceptions. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *see Catholic Charities of Jackson, Lenawee, & Hillsdale Counties v. Whitmer*, 162 F.4th 686, 692-693 (6th Cir. 2025) (describing viewpoint discrimination as "an egregious form of content discrimination" that "targets 'particular views taken by speakers on a subject' ") (citation omitted). S.B. 183 imposes unique requirements on a specific type of speech (proxy advisory services) by a class of speakers (proxy advisors that give advice "for compensation") based on Kentucky's desire to suppress disfavored speech and elevate other favored speakers (including company boards). S.B. 183 does not apply equally to *all* speakers that advise institutional investors about how to vote on proxy proposals: It does not apply to company management, shareholder proponents of proxy proposals, those who solicit proxy votes, other shareholders, or anyone willing to give their advice away for free. The law instead isolates and burdens only proxy advisors who provide services "for

24

compensation" based on Kentucky's belief that these advisors "influence or control large percentages of shareholder votes" but are too easily influenced by "activist investors."[14]

74.     Content and viewpoint discrimination are also inherent in S.B. 183's design and purpose. The Legislature made clear that it was singling out environmental, social, political, or ideological interests "because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (citation and brackets omitted). The bill's sponsor referred to "ideological or politically motivated desire[s]" as "bad policy," and invited a witness to testify as to how "climate agenda[s]" exemplified the type of proposals S.B. 183 seeks to suppress.[15] Kentucky may disagree with the advice ISS gives. But no matter how perturbed it is by what it deems "shareholder activism," the Commonwealth may not "burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-579.

75.     ***Compelled speech.***  "In this Nation, no official . . . may command our tongues." *Chiles*, 146 S. Ct. at 1021. That means that "no government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold." *303 Creative LLC v. Elenis*, 600 U.S. 570, 599-600 (2023) (cleaned up). Yet that is exactly what S.B. 183 attempts to do.

76.     Whenever ISS gives advice "against" or "inconsistent" with company boards or, if consistent with the client's direction, considers "an environmental, social, political, or ideological interest" that ISS has not proved has a "direct and material connection to the financial risk or financial return of an investment," the law demands that ISS denigrate its speech as "not being

---

[14]   Ky. Senate Chambers Hr'g at 12:15-12:40 (Feb. 10, 2026) (Sen. Nunn), https://ket.org/legislature/archives/2026/regular/senate-chambers-8egjh6; *see also id.* ("Proxy advisors . . . are the perfect vehicle for activist investors ….")

[15] Ky. House Banking & Insurance Committee Hr'g at 13:23-14:12 (Mar. 11, 2026) (Sen. Nunn), https://ket.org/legislature/archives/2026/regular/house-banking-and-insurance-committee-room154; *id.* at 15:38-16:23 (Mr. Nolan).

provided solely in the interest of shareholders" and forces ISS to state that its "advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one (1) or more nonpecuniary interests." S.B. 183 §§ 1(7), 2(2)(a)(1). And if ISS advises different clients with different preferences to vote in different ways, S.B. 183 would compel ISS to rank which advice was "solely in the interest of shareholders" and "[s]upported by an economic analysis," *id.* § 2(3)(b), forcing ISS to undertake a fraught comparative analysis on controversial issues such as disclosures about climate change risk and executive compensation, when many of ISS' clients may disagree.

77. Requiring ISS to repudiate its message, including on controversial political issues, rank its clients' preferences, and disparage its own advice "plainly alters the content" of ISS' speech and is "presumptively unconstitutional." *NIFLA*, 585 U.S. at 766 (citations and quotation marks omitted). Demanding that ISS describe its services as "nonpecuniary," that the services "sacrific[e] investment returns or undertak[e] additional investment risk," and that some advice, as opposed to other advice, is "solely in the interest of shareholders" forces ISS to promote state-sponsored views with which ISS disagrees. *See* S.B. 183 §§ 1(7), 1(13), 2(1)(a), 2(2)(a)(1). Proxy advice is "by its nature judgmental" and a matter of "opinion[]" for which there "is not a 'correct' viewpoint." 57 Fed. Reg. at 48,278. Moreover, ISS is not in the business of predicting stock returns; ISS' research reports and voting recommendations are informational and take into account the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different voting recommendations on the same issue based on each client's chosen criteria. And many proxy ballot issues do not lend themselves to financial quantification. It is unclear how anyone could purport to predictably quantify the "economic benefits and costs" "in the long and short term" of a vote for one director on the company board over another, a vote to ratify or reject

a particular auditor, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes. *See* S.B. 183 § 1(4)(d). Perhaps that is why no rule requires company issuers, shareholder proponents, or solicitors of proxy votes to quantify the "economic benefits and costs" of proxy voting proposals, even though all those entities would be better situated than ISS to try to do so.

78. These forced statements also misleadingly suggest that there is a single correct answer and that ISS' analyses and advice are not rigorous. These warnings, moreover, make no sense: Because many clients subscribe to more than one policy, S.B. 183 would force ISS to provide warnings to a client if ISS recommends against company management under one of the client's policies, but not if ISS recommends supporting the company's position under another of the client's policies—even on the same vote. And by exempting pro-management recommendations, S.B. 183 falsely suggests that management's recommendations are rigorous and backed by extensive modeling when that only rarely is the case.

79. S.B. 183 would then force ISS to disseminate these compelled statements not only to its clients, but also to the companies about which ISS provides advice, and, in some cases, the Kentucky Attorney General. *See id.* § 2(2)(a)(2), 2(3). The law would also force ISS to reveal confidential information to these companies—requiring ISS to "[e]xplain[], with particularity, the basis of [ISS'] advice concerning each recommendation." *Id.* § 2(2)(a)(2).

80. S.B. 183 thus forces ISS "to create speech on weighty issues with which [ISS] disagrees" and then disseminate that speech to an audience ISS has not chosen. *303 Creative*, 600 U.S. at 599. That is textbook compelled speech.

81. ***Strict scrutiny.*** Whether viewed as compelled speech or content and viewpoint discrimination, S.B. 183 is unconstitutional. Compelled speech is anathema to the First

Amendment; courts thus regularly reject compelled-speech laws without considering whether they could survive strict scrutiny. *See, e.g.*, *303 Creative*, 600 U.S. at 603. And viewpoint discrimination is never constitutionally permissible. *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) ("The Court's finding of viewpoint bias end[s] the matter."). At bare minimum, strict scrutiny applies, and S.B. 183 cannot survive it: S.B. 183 is not "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766 (citation omitted). Kentucky does not have a legitimate interest—let alone a compelling one—in forcing ISS to make misleading and false statements to its clients and the public and share confidential information with companies all over the world. Nor is S.B. 183 tailored in any fashion—let alone narrowly—to any permissible state interest.

82. Kentucky cannot prove that a commercial-speech exception to strict scrutiny applies. Commercial speech is speech that does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (citation omitted). The speech that S.B 183 targets plainly does much more: S.B 183 purports to compel ISS' speech on controversial social and political issues. ISS' speech is at the very least "inextricably intertwined" with "otherwise fully protected speech," meaning strict scrutiny applies. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988). Even under some lesser standard of scrutiny, however, S.B. 183 could not survive.

83. Because S.B. 183's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law, the entire law must be invalidated and enjoined as to ISS. Unless invalidated and enjoined as to ISS, S.B. 183 will deprive ISS of its First Amendment rights and cause it to suffer irreparable injuries.

**COUNT TWO**
**(First and Fourteenth Amendments—Due Process—Void for Vagueness)**

84. ISS incorporates all prior paragraphs of this Complaint.

85. Under the Fourteenth Amendment's Due Process Clause, a state law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-254 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

86. S.B. 183 is unconstitutionally vague as applied to ISS. It is vague in the conditions that trigger S.B. 183's burdensome disclosure requirements, and once those requirements are triggered, it is vague about what ISS is supposed to do to comply.

87. S.B. 183's triggering conditions are not clearly defined. That defect starts with the law's first trigger: the consideration of a "nonpecuniary interest[]," S.B. 183 § 2(1)(a), which is defined as an interest including, but not limited to, an "environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment," *id.* § 1(7). That language is intractably vague. S.B. 183 does not define what constitutes an "environmental, social, political, or ideological" interest, enumerate what interests *outside* these categories will trigger the statute's warning obligations, or define a "direct" connection. And the law's definition of a "material connection" turns on a cryptic "reasonable investor" standard. *Id.* § 1(5). Such gaping holes in the statutory scheme cannot provide the "objective criteria" necessary to provide fair notice of the prohibited conduct. *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (citation omitted).

88.    Other triggering conditions are similarly vague.  For instance, the law does not explain whether advice is "against" a proposal if ISS recommends abstaining from the vote, S.B. 183 §§ 1(6), 2(1)(c), nor whether the answer depends on how a particular company's bylaws treat abstentions.  The law also does not say what ISS must do if required to produce a "written economic analysis," *see id.* § 2(1)(b)(2), but the issue does not lend itself to the sort of quantification demanded by S.B. 183's definition of "economic analysis," *id.* § 1(4).

89.    If the required disclosures are triggered, S.B. 183 also leaves substantial uncertainty about how ISS should comply.  For instance, the law does not explain what counts as a "[c]onspicuous[]" disclosure, *id.* § 2(2)(a)(1); how much "particularity" is required, *id.* § 2(2)(a)(2); how quickly ISS must act to "[i]mmediately" provide disclosures to the relevant companies when it provides a service "that is not solely in the interest of shareholders," *id.* § 2(2)(b), or to issue the required warnings when it provides "materially different advice," *id.* § 2(3)(b).    On top of that, the law's compliance requirement incorporates the vague "nonpecuniary" term. *See id.* § 2(2)(a)(1)-(2), 2(3).

90.    This vagueness invites arbitrary enforcement.  For the same reasons the law leaves ISS guessing at how to comply, it fails to "establish minimal guidelines to govern law enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted), thus leaving enforcement up to the Attorney General's "personal predilections," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

91.    S.B. 183 imposes quasi-criminal penalties on proxy advisors that fail to comply: The Kentucky Attorney General can seek civil penalties of up to $2,000 "*per violation*," which could quickly add up to a staggering sum.  Ky. Rev. Stat. § 367.990(2) (emphasis added).  S.B. 183's breadth, including its failure to delineate the boundaries of what constitutes impermissible

30

"nonpecuniary" interests, would force ISS to *over*-comply with the statute's requirements to avoid these penalties, thereby chilling ISS from exercising its First Amendment speech rights.

92.    Because S.B. 183's unconstitutionally vague provisions are integral to the entire law, the entire law must be invalidated and enjoined as to ISS.  Unless invalidated and enjoined as to ISS, S.B. 183 will deprive ISS of its due-process rights and cause it to suffer irreparable injuries.

## COUNT THREE
### (Dormant Commerce Clause)

93.    ISS incorporates all prior paragraphs of this Complaint.

94.    The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "Although the Clause is framed as a positive grant of power to Congress," the Supreme Court has "long held that this Clause also prohibits state laws that unduly restrict interstate commerce."  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (citation omitted).  This negative aspect of the Commerce Clause extends to state laws implicating foreign commerce as well.  *See, e.g.*, *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7-8 (1986); *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006).

95.    ***Direct regulation of out-of-state commerce.***  A state law violates the dormant Commerce Clause when it directly regulates commerce that "takes place wholly outside of the State's borders."  *Edgar*, 457 U.S. at 642-643 (plurality op.); *see Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 101 (6th Cir. 1989); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar* plurality op.); *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir. 2005) ("Although the language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce.").

31

96.     S.B. 183 directly regulates ISS' transactions with its non-Kentucky clients.  The law imposes onerous burdens on ISS whenever ISS provides to clients advice "not solely in the financial interest of shareholders" or "materially different advice," even if neither ISS' client nor the company that is the subject of the advice is located in Kentucky.  *See* S.B. 183 § 1(1) (defining a "[c]ompany" as any "business entity that is doing business in this state as defined in [Ky. Rev. Stat.] 141.010(13)"); Ky. Rev. Stat. §141.010(13) (defining "[d]oing business" to include "[d]eriving income from or attributable to sources within this state" and "[d]irecting activities at Kentucky customers for the purpose of selling them goods or services").  Even if a company may be "doing business" in Kentucky under Kentucky law, when ISS provides a recommendation to a non-Kentucky client about that company, that transaction takes place entirely outside of Kentucky.

97.     The application of S.B. 183 to out-of-state transactions between ISS and ISS' non-Kentucky clients violates the dormant Commerce Clause.  *See, e.g.*, *Edgar*, 457 U.S. at 641-643 (plurality op.) (invalidating law that "directly regulate[d] transactions which take place across state lines, even if wholly outside the State").  Unless invalidated and enjoined as to ISS' out-of-state transactions, S.B. 183 will cause ISS to suffer irreparable injuries.

98.     ***Unduly burdening interstate and foreign commerce***.  A state law also violates the dormant Commerce Clause when its burdens on interstate or foreign commerce are "clearly excessive in relation to the putative local benefits."  *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)); *see Ross*, 598 U.S. at 379 ("[T]his Court has left the courtroom door open to challenges premised on even nondiscriminatory burdens.") (citation and quotation marks omitted); *see also South-Central*, 467 U.S. at 99-101 (considering whether state law excessively burdened foreign commerce); *Piazza's Seafood*, 448 F.3d at 750 ("State regulations violate the dormant Commerce Clause by … unduly

32

burdening foreign or interstate commerce."). "It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny." *South-Central*, 467 U.S. at 100.

99. S.B. 183 imposes multiple substantial burdens on interstate and foreign commerce. First, the law's global reach is itself a substantial burden: It imposes onerous obligations on every covered proxy advisor whenever it provides any service covered by S.B. 183—regardless of where that advisor, the advisor's client, or the company that is the subject of the recommendation is located—so long as the company with which the service concerns maintains some nominal connection to Kentucky.

100. Second, and relatedly, S.B. 183's burdens fall disproportionately on interstate and foreign commerce because proxy advisors are overwhelmingly located outside of Kentucky and serve out-of-state clients. Even those proxy advisors "with no interest in serving [Kentucky's] market would have to meet [S.B. 183's] requirements," *Truesdell v. Friedlander*, 80 F.4th 762, 776 (6th Cir. 2023), because of S.B. 183's sheer breadth. After all, the law regulates all proxy advisors whose recommendations or advice concern companies that "do[] business" within the Commonwealth, and because ISS has no way of knowing the myriad income sources of the companies with which its advice might touch, ISS is "forced to comply" with Kentucky law to avoid S.B. 183's significant penalties. *Ross*, 598 U.S. at 399-400. This burden "harms . . . the interstate market itself." *Id.*

101. Third, the law distorts the global market for proxy advisory services, distortions which could cascade through interstate and foreign commerce more generally, considering the broad scope of the services covered by S.B. 183. S.B. 183's already-substantial burdens are magnified when considering that other states may—and likely will—"adopt[] similar legislation."

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment) (citation omitted); *see Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583-584 (1986).

102.    On top of that, S.B. 183 undermines "the special need for federal uniformity" in "foreign intercourse and trade." *Wardair Canada*, 477 U.S. at 8 (citation omitted). This "policy of uniformity, embodied in the Commerce Clause, . . . presumptively prevails when the Federal Government has remained silent." *Id.* S.B. 183 also "create[s] a substantial risk of conflicts with foreign governments," *Piazza's Seafood*, 448 F.3d at 750 (citation omitted), with different understandings of what is in shareholders' interests and a proxy advisor's role.

103.    The substantial burdens S.B. 183 imposes on interstate and foreign commerce outweigh any local interest Kentucky may have in regulating how ISS serves its clients. S.B. 183's sponsor admitted that "most Kentuckians will never personally hire a proxy advisor."[16] Others noted that the law would impact "maybe 50 Kentuckians."[17] To the extent Kentucky has any local interests, they are either already sufficiently protected or "could be promoted as well with a lesser impact on interstate activities," *Pike*, 397 U.S. at 142, including, for example, through educational campaigns. By imposing substantial burdens on interstate commerce that clearly exceed local benefits, S.B. 183 violates the dormant Commerce Clause.

104.    Because S.B. 183's unconstitutionally burdensome provisions are integral to the entire law, the entire law must be invalidated and enjoined as to ISS. Unless invalidated and enjoined as to ISS, S.B. 183 will cause ISS to suffer irreparable injuries.

---

[16]    Ky.    Senate    Chambers    Hr'g    at    13:50-13:55    (Feb.    10,    2026), https://ket.org/legislature/archives/2026/regular/senate-chambers-8egjh6 (Sen. Nunn).

[17] *Id.* at 14:41-15:08 (Sen. Thomas).

**COUNT FOUR**
**(Fourteenth Amendment—Due Process—Prohibition on**
**State Laws that Regulate Extraterritorially)**

105.    ISS incorporates all prior paragraphs of this Complaint.

106.    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Supreme Court has long recognized that the Due Process Clause, like the Commerce Clause, prohibits a State from "exercis[ing] 'extra territorial jurisdiction' "—a State may not "regulate and control activities wholly beyond its boundaries."  *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954); *accord Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 149 (1934).  Due process requires "some minimal contact" between the "regulated *party* and the state" and between the "regulated *subject matter* and the state."  *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001) (citation omitted); *see also, e.g.*, *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 436 (4th Cir. 1999).  "[I]f a State has only an insignificant contact with the part[y] and the occurrence or transaction, application of its law is unconstitutional."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310-311 (1981).

107.    Kentucky lacks any significant contacts with ISS when ISS provides services to clients located outside of Kentucky, even if that service concerns a company that is "doing business" in Kentucky under state law.  Such services are transactions that take place entirely outside of Kentucky.

108.    Accordingly, the application of S.B. 183 to ISS and its transactions with its non-Kentucky clients violates the Due Process Clause's restriction on extraterritorial state regulation. Unless invalidated and enjoined as to ISS, S.B. 183 will cause ISS to suffer irreparable injuries.

35

## COUNT FIVE
### (Horizontal Separation of Powers)

109.    ISS incorporates all prior paragraphs of this Complaint.

110.    In addition to the restraints on extraterritorial legislation imposed by the dormant Commerce Clause and the Due Process Clause, the Constitution more generally bars States from directly regulating conduct that takes place entirely in another State. This equal-sovereignty principle is embedded in several of the Constitution's structural protections, rooted in the historical tradition, and inherent in the plan of the Convention itself. *See Ross*, 598 U.S. at 376 n.1; *id.* at 408-410 (Kavanaugh, J., concurring in part and dissenting in part); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (explaining that this principle is "an 'obviou[s]' and 'necessary result' of our constitutional order," and "is not confined to any one clause or section, but is expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' interactions with one another") (citation omitted); *cf. PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 501 (2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design.' ") (citation omitted).

111.    To start, the "territorial limits of state authority," *Ross*, 598 U.S. at 376 n.1, are implicit in the founding premise that "[a]ll States enjoy equal sovereignty," *Shelby County v. Holder*, 570 U.S. 529, 535 (2013). "The constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized," *Coyle v. Smith*, 221 U.S. 559, 580 (1911), and accordingly, "States are restricted within the orbits of their lawful authority," *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). When a State "directly regulate[s] out-of-state transactions . . . with no connection to the State," *Ross*, 598 U.S. at 376 n.1 (emphases omitted), it invades the sovereignty of its sister States. The plan of the Convention thus necessarily

restricts States from directly regulating conduct that neither occurs in nor is directed within their borders; a Union of equal States could not succeed if each State could regulate conduct within another.

112.    Several provisions of the Constitution, in addition to the Commerce Clause and the Due Process Clause, reflect and implement this equal-sovereignty principle prohibiting one State from directly regulating conduct occurring in another State.  Article I, Section 10 strips States of traditional sovereign powers that could be wielded against one another, including the right to "lay any Imposes or Duties on Imports or Exports" and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with other State."  U.S. Const. art. I, § 10, cl. 2-3.  Article IV, in turn, preserves the rights of each State in relation to each, requiring, among other things, that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1.  And the Tenth Amendment ensures that each State preserves its own "integrity, dignity, and residual sovereignty."  *Bond v. United States*, 564 U.S. 211, 221 (2011); *see* U.S. Const. amend. X.  In short, as the Supreme Court recently recognized, "the territorial limits of state authority under the Constitution's horizontal separation of powers" barring a State from directly regulating transactions occurring outside of the State's borders inhere in "the original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces."  *Ross*, 598 U.S. at 376 & n.1 (citation omitted).

113.    When ISS transacts with its non-Kentucky clients, even when those transactions concern a company "doing business" in Kentucky under state law, ISS does so wholly outside of Kentucky's borders.  S.B. 183 purports to directly regulate those transactions.

114.    By directly regulating out-of-state transactions, S.B. 183 violates the Constitution's horizontal separation of powers.  Unless invalidated and enjoined as to ISS, S.B. 183 will cause ISS to suffer irreparable injuries.

## PRAYER FOR RELIEF

For the foregoing reasons, ISS prays for the following relief:

a.    Declare that S.B. 183 unconstitutionally infringes ISS' free speech rights under the First and Fourteenth Amendments of the U.S. Constitution;

b.    Declare that S.B. 183 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, as applied to ISS;

c.    Declare that S.B. 183 violates the Commerce Clause of the U.S. Constitution, the Due Process Clause's prohibition on exterritorial regulation, and/or the horizontal separation of powers protected by the U.S. Constitution, either on its face or as applied to ISS;

d.    Declare that S.B. 183's invalid provisions are integral to and inseverable from any surviving portion, such that S.B. 183 must be declared invalid in its entirety as applied to ISS;

e.    Preliminarily and permanently enjoin Defendant and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce S.B. 183 against ISS, including but not limited to intervention in any private right of action, *see* S.B. 183 § 3(3)(a);

f.    Enter judgment in favor of ISS;

g.    Award reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

h.    Award ISS all other relief as the Court deems just and proper.

38

Dated: May 14, 2026                          Respectfully submitted,

                                             /s/ *Cory J. Skolnick*
BRUCE D. OAKLEY*                             CORY J. SKOLNICK
  bruce.oakley@hoganlovells.com                cskolnick@fbtgibbons.com
HOGAN LOVELLS US LLP                         J. AUSTIN HATFIELD
609 Main Street, Suite 4200                    ahatfield@fbtgibbons.com
Houston, TX 77002                            FBT GIBBONS LLP
Tel: (713) 632-1420                          400 West Market Street, 32nd Floor
Fax: (713) 632-1401                          Louisville, KY 40202
                                             Tel: (502) 589-5400
JESSICA L. ELLSWORTH*                        Fax: (502) 581-1087
  jessica.ellsworth@hoganlovells.com
DAVID M. FOSTER*
  david.foster@hoganlovells.com
MICHAEL J. WEST*
  michael.west@hoganlovells.com
DANA A. RAPHAEL*
  dana.raphael@hoganlovells.com
SAM ZWINGLI*
  sam.zwingli@hoganlovells.com
KEENAN H. ROARTY*
  keenan.roarty@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

* application for pro hac vice forthcoming

*Counsel for Plaintiff Institutional Shareholder Services Inc.*